**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Michael Lee JONES, Defendant–Appellant.**

**No. 09CA2362.**

Colorado Court of Appeals, Div. III.

Aug. 18, 2011.

Rehearing Denied Oct. 6, 2011.

John W. Suthers, Attorney General, Katherine A. Aidala, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Nora V. Kelly, P.C., Nora V. Kelly, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge J. JONES.

Defendant, Michael Lee Jones, appeals the judgment of conviction entered on jury verdicts finding him guilty of sexual assault and unlawful sexual contact. We reverse the judgment and remand the case for a new trial.

## I. Background

On December 1, 2005, J.R. called emergency dispatch and said she had been sexually assaulted. Three police officers responded to her apartment, where they found her upset and crying and smelled the odor of alcohol on her breath. She had no visible injuries. The officers took her to a hospital to have a sexual assault examination performed.

At the hospital, J.R. told the triage nurse that she had been raped. When a doctor examined her, she complained of neck and jaw pain resulting from her assailant holding her mouth tightly closed while he assaulted her. Thereafter, she saw a sexual assault nurse examiner (SANE nurse), who collected forensic evidence and examined her for signs of sexual assault. The SANE nurse found one visible injury: a half-centimeter long tear to J.R.'s genitalia. The nurse later testified that such tears were common injuries in sexual assault victims but were also consistent with consensual sexual intercourse.

After the police determined that the DNA in the forensic evidence matched defendant's DNA, the People charged him with numerous offenses. However, only the charges for which defendant was ultimately convicted were tried.

Before trial, J.R. died of causes unrelated to the alleged assault. Defendant moved to prevent the People from introducing the tape recording of J.R.'s emergency dispatch call and her statements to the medical personnel, arguing that they were testimonial. After a hearing, the district court concluded that (1) the emergency dispatch tape recording and

J.R.'s statements about the assault to the SANE nurse were testimonial and, therefore, inadmissible; (2) the SANE nurse could, however, testify about her examination of J.R. and the conclusions she drew therefrom; and (3) J.R.'s statements to the triage nurse and doctor were admissible. Defendant also moved to prevent the People from introducing CRE 404(b) evidence that he had allegedly sexually assaulted three other women. The district court denied the motion, concluding that the evidence was admissible to show "common plan, scheme, or design, and to rebut the defense of consent."

After a five-day trial, a jury found defendant guilty of sexual assault and unlawful sexual contact.[1] The district court sentenced defendant to twenty-four years to life in the custody of the Department of Corrections for sexual assault, and twelve years for unlawful sexual contact, to be served concurrently, plus twenty years of mandatory parole.

## II. Discussion

Defendant contends that the district court erred by (1) admitting evidence under CRE 404(b) that he had allegedly sexually assaulted two other women[2] because those incidents were insufficiently similar to his alleged assault of J.R.; (2) admitting the police officers' and medical personnel's testimony about J.R.'s allegedly testimonial statements to them, in violation of the federal Confrontation Clause; and (3) denying his motion requesting the presiding judge's recusal after the judge had found defense counsel in contempt of court during trial.

### A. CRE 404(b)

#### 1. Applicable Law

##### a. General Principles

Rule 404(b) prohibits the admission of evidence about a defendant's prior acts when offered to show his bad character and that he acted in conformity with that character. *Kaufman v. People*, 202 P.3d 542, 552 (Colo. 2009). However, other act evidence is admissible for other reasons, including to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." CRE 404(b); *see Kaufman*, 202 P.3d at 552.

Similarly, section 16–10–301, C.R.S. 2010, provides that in sexual offense prosecutions, the People may introduce other act evidence

for any purpose other than propensity, including: Refuting defenses, such as consent . . .; [or] showing a common plan, scheme, design, or modus operandi, regardless of whether identity is at issue and regardless of whether the charged offense has a close nexus as part of a unified transaction to the other act.

§ 16–10–301(1), (3). Before admitting evidence under this section, the district court must perform a Rule 404(b) admissibility analysis. *People v. Snyder*, 874 P.2d 1076, 1078 (Colo.1994); *People v. Martinez*, 36 P.3d 154, 158–59 (Colo.App.2001). The court must determine that (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the intermediate inference that the defendant was acting in conformity with his bad character; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Kaufman*, 202 P.3d at 552; *accord People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990).

Because the district court has substantial discretion in determining whether Rule 404(b) evidence is admissible, we will not overturn the court's decision unless it is manifestly arbitrary, unreasonable, or unfair. *Kaufman*, 202 P.3d at 553. And, because the People agree that defendant preserved this issue in the district court, if we determine

---

1. Defendant did not testify or introduce any evidence in his defense. He did seek to introduce a police detective's testimony that, about four months after the alleged assault, the People charged J.R. with false reporting in connection with another alleged sexual assault. However, the district court concluded that the evidence was inadmissible.

2. Because the People failed to provide complete discovery for the alleged assault involving the third woman, the district court concluded that evidence concerning that incident was inadmissible.

that the court abused its discretion, we review any error for harmless error. *Yusem v. People*, 210 P.3d 458, 469 & n. 16 (Colo.2009); *People v. Munoz*, 240 P.3d 311, 319 (Colo. App.2009). An error is not harmless where there is a reasonable probability that it contributed to a defendant's conviction by substantially influencing the verdict or impairing the fairness of the trial. *Yusem*, 210 P.3d at 469; *People v. Rincon*, 140 P.3d 976, 979–80 (Colo.App.2005).

Defendant concedes that the evidence about the two alleged assaults related to a material fact—whether he caused J.R. to submit to sexual intercourse "by means of sufficient consequence reasonably calculated to cause [her] submission against [her] will." *See* § 18–3–402(1)(a), C.R.S.2010 (defining sexual assault). Therefore, we need not address the first prong of the *Spoto* test. Our analysis below focuses on the second and third prongs, and therefore we set out the law applicable to those considerations.

### b. Logically Relevant

■ Evidence is logically relevant if it has any tendency to make the existence of a material fact more or less probable than it would be without the evidence. *Yusem*, 210 P.3d at 463; *see* CRE 401. In a sexual assault prosecution, evidence of the defendant's other alleged sexual assaults may be logically relevant under the "doctrine of chances." *People v. Everett*, 250 P.3d 649, 656–60 (Colo.App.2010); *see People v. Rath*, 44 P.3d 1033, 1042 & n. 7 (Colo.2002). This doctrine posits that evidence that a defendant repeatedly performed an unusual act over time decreases the probability that he acted accidentally or innocently. *See Everett*, 250 P.3d at 656; *see also Douglas v. People*, 969 P.2d 1201, 1206 n. 6 (Colo.1998) (" 'The more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence of repetition of the act increases the likelihood of a mens rea or mind at fault.' " (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5.05 (1996))). Thus, in a sexual assault prosecution, if the defendant claims that the complainant consented, or that there

is an absence of evidence of lack of consent, as defendant did here, evidence that he committed other sexual offenses may be admissible under the doctrine of chances because

> "[w]hen one person claims rape, the unusual and abnormal element of lying by the complaining witness may be present. But, when two (or more) persons tell similar stories, the chances are reduced that both are lying or that one is telling the truth and the other is coincidentally telling a similar false story."

*Everett*, 250 P.3d at 657 (quoting *People v. Balcom*, 7 Cal.4th 414, 27 Cal.Rptr.2d 666, 867 P.2d 777, 787 (1994) (Arabian, J., concurring)).

### c. Logical Relevance Independent of Impermissible Inference

■ The third prong of the *Spoto* test requires other act evidence to be logically relevant absent the impermissible inference that because the defendant committed the other acts, he had a propensity to commit the charged offense and, therefore, committed it. *Yusem*, 210 P.3d at 466. Evidence admitted under the doctrine of chances does not rely on this inference where the evidence of the defendant's repeated unusual conduct leads to an objective or statistical likelihood that he committed the actus reus rather than a subjective probability that he did so based on his character. *Spoto*, 795 P.2d at 1319; *People v. Herron*, 251 P.3d 1190, 1197 (Colo.App. 2010) ("Jurors could thus rely on their common sense and knowledge of human experience, rather than on a subjective impression of defendant's character, to find his claim to an innocent state of mind improbable."). Thus, "it is [the] defendant's tendency to commit an act in a particular way that is relevant, not [the] defendant's general character." *People v. Delgado*, 890 P.2d 141, 144 (Colo.App.1994).

■ To ensure that evidence based on the doctrine of chances has probative value independent of an impermissible inference about the defendant's character, the court must determine that (1) the evidence of the other acts is similar to the charged crime; (2) the number of unusual occurrences in which the defendant has been involved exceeds the fre-

quency rate for the general population; and (3) there is a genuine dispute between the prosecution and the defense over whether the actus reus occurred. *Everett,* 250 P.3d at 658 (citing Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition,* 51 Ohio St. L.J. 575, 588–93 (1990)).

 A dissimilar prior act is not probative under the doctrine of chances because it is the improbability of a like result being repeated by mere chance that gives the other act its probative weight. *Spoto,* 795 P.2d at 1320; *see Everett,* 250 P.3d at 658; *see also Yusem,* 210 P.3d at 467 (noting that although Rule 404(b) does not require similarity, a lack of similarity may support a conclusion that the other act evidence's logical relevance is not independent of the impermissible inference about the defendant's character). The degree of similarity necessary depends on the purpose for which the evidence is offered: evidence seeking to establish the defendant's identity requires the most similarity, while evidence seeking to prove the defendant's intent or the occurrence of the actus reus requires less. *Rath,* 44 P.3d at 1042 & n. 7; *see also Brown v. State,* 96 S.W.3d 508, 512–13 (Tex.Ct.App.2002).

## 2. Application

We conclude that the evidence of the other two alleged assaults was not logically relevant, independent of the impermissible—but not illogical—inference that defendant acted in conformity with his bad character.

 As noted, the district court admitted the evidence about the prior alleged assaults to show "common plan, scheme, or design, and to rebut the defense of consent." For evidence of common plan, scheme, or design to be admissible under the doctrine of chances,

> the evidence of prior conduct must demonstrate not merely similarity in results, but such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the charged crime and the prior misconduct are the individual manifestations.

*State v. Lough,* 125 Wash.2d 847, 889 P.2d 487, 494 (1995); *see Delgado,* 890 P.2d at 143–44 (the relevancy of common plan evidence is "because of the striking similarities in the acts, [which] makes it at least somewhat more probable that defendant was again implementing the plan in committing the crime alleged").[3]

 Similarly, to be admissible to rebut the defense of consent, evidence of the prior acts should "establish[ ] a compelling pattern and remarkable similarity of [the] defendant's sexual misconduct." *People v. McKibben,* 862 P.2d 991, 993 (Colo.App.1993); *see State v. Plaster,* 424 N.W.2d 226, 230 (Iowa 1988) (considering whether the prior sexual conduct "tend[ed] to show the same peculiar and characteristic behavior pattern manifested in the crime charged"); *State v. Lamoureux,* 623 A.2d 9, 13 (R.I.1993) (evidence that a defendant assaulted another woman in nearly identical circumstances as those in the crime charged is strongly probative on the issue of lack of consent).[4] Though the man-

**3.** As noted, section 16–10–301 allows the district court to admit evidence that the defendant committed other sexual offenses to show "common plan, scheme or design, or modus operandi ... regardless of whether the charged offense has a close nexus as part of a unified transaction to the other act." This language indicates that evidence of a "common plan, scheme, or design" need not prove that there was an overarching plan, but rather, like modus operandi, that the defendant had a distinctive manner of carrying out a particular offense. *See People v. Campbell,* 58 P.3d 1148, 1160–61 (Colo.App.2002) (holding that, under Rule 404(b), evidence of a prior conviction did not have to be part of a sequence of events leading to the charged crime's commis-

sion to qualify as evidence of a common plan and that "method of practice" is analogous to a "common plan, scheme, or design").

**4.** *See also State v. Hill,* 104 Ariz. 238, 450 P.2d 696, 697 (1969); *Williams v. State,* 621 So.2d 413, 415–17 (Fla.1993); *People v. Luczak,* 306 Ill.App.3d 319, 239 Ill.Dec. 698, 714 N.E.2d 995, 999 (1999); *State v. Hampton,* 215 Kan. 907, 529 P.2d 127, 129 (1974), *overruled on other grounds by State v. Cantrell,* 234 Kan. 426, 673 P.2d 1147 (1983); *People v. Oliphant,* 399 Mich. 472, 250 N.W.2d 443, 446–50 (1976); *Youngblood v. Sullivan,* 52 Or.App. 173, 628 P.2d 400, 401–02 (1981); *State v. Willis,* 370 N.W.2d 193, 197–98 (S.D.1985); *Martin v. State,* 173 S.W.3d 463,

ner of committing the other offenses need not replicate in every respect the manner in which the charged offense was committed, *McKibben*, 862 P.2d at 993, "the methods used in the commission of the acts being compared must be both similar to each other and dissimilar from the methods generally used in such an offense," *Delgado*, 890 P.2d at 144 (emphasis in original); *see also State v. Esposito*, 192 Conn. 166, 471 A.2d 949, 953 (1984) (" 'the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together' " (quoting *People v. Haston*, 69 Cal.2d 233, 70 Cal.Rptr. 419, 444 P.2d 91, 99 (1968))).

▮▮▮ As relevant here, the People introduced the following evidence about the alleged assault on J.R.:

- J.R. was a white female with blonde hair;
- she had been seen entering and walking away from a 7–Eleven store around 2:00 a.m. the morning of the alleged assault;
- the police responded to her apartment on a report of a sexual assault around 3:00 a.m.;
- her breath smelled of alcohol when the police arrived; and
- her assailant held her mouth tightly closed while he assaulted her.

The evidence the People introduced about the other alleged assaults was, however, more detailed.

I.B., a white woman who had blonde hair at the time of her alleged assault, testified that on the night of February 20–21, 2005, while in Miami, she had several drinks before returning to her hotel room around 12:00 a.m. She fell asleep for a short time and,

when she awoke, an unknown man was in her room. He put something over her face and she blacked out. Three men carried her to a car, where one man completely undressed her, and another man, whom she ultimately identified as defendant, sexually assaulted her by vaginally and anally penetrating her and forcing her to perform oral sex. Thereafter, the men took her to two remote locations where they severely beat her, stole her jewelry, demanded the numbers of her and her father's bank accounts, and forced her to drink a strong alcoholic beverage. I.B. testified that some of her facial injuries were so severe that she required reconstructive surgery and stitches.

K.U. testified that, while visiting New Orleans in May 2003, she was walking back to her hotel alone around 3:00 a.m. after drinking "quite a bit" when an unknown man, whom she identified as defendant, pulled over in his car and offered her a ride. When she got in the car, she briefly fell asleep and he drove her to an unfamiliar place, stopped the car, and got out. She tried to run from him, but he caught her, put his hand over her mouth, and told her to shut up. He then took off her pants and sexually assaulted her by vaginally penetrating her. K.U. testified that he was "pretty rough" with her, and that after the attack she had scratches on her back and legs and bruising on her arms.

We first note that there are significant dissimilarities between the alleged assaults on I.B. and K.U. and the alleged assault on J.R. Unlike I.B. and K.U., J.R. was not staying at a hotel, her only visible injury was to her genitalia, and there was no evidence that defendant was a stranger to her. Unlike the alleged assault on I.B., there was no evidence that J.R. was assaulted by a group of men, or that her assailant had stolen from her or asked for her account numbers. And, unlike the alleged assault on K.U., the People introduced no evidence at trial that defendant

466–67 (Tex.Crim.App.2005); *State v. Nelson-Waggoner*, 6 P.3d 1120, 1125–27 (Utah 2000); *but see Lafayette v. State*, 917 N.E.2d 660, 662–66 (Ind.2009) (evidence of other acts inadmissible to show consent, apparently regardless of similarity); *Hurst v. State*, 400 Md. 397, 929 A.2d 157, 162–68 (2007) (other acts evidence inadmissible to show consent despite some similarity of acts); *State v. Whittaker*, 138 N.H. 524, 642 A.2d 936,

937–40 (N.H.1994) (other acts evidence inadmissible under any theory despite similarities); *Foster v. Commonwealth*, 5 Va.App. 316, 362 S.E.2d 745, 747–49 (1987) (other acts evidence irrelevant to show consent even if acts are similar); *State v. Saltarelli*, 98 Wash.2d 358, 655 P.2d 697, 698–700 (1982) (other acts evidence inadmissible where only issue was consent even though acts were similar).

offered J.R. a ride in his car or drove her to a remote location.[5] Moreover, I.B.'s and K.U.'s assaults differed from each other with respect to the number of people involved, the amount of clothing taken off, the severity and manner of inflicting the physical injuries, and the type of intercourse involved.

Further, we perceive few telling similarities between the alleged assaults on I.B. and K.U. and the alleged assault on J.R.[6] I.B. and J.R. were both white women with blonde hair and, possibly, were both assaulted in the early morning hours after they had been drinking (though the People did not introduce any evidence about whether J.R. began drinking before, during, or after the alleged assault). K.U. and J.R. were both white women who were allegedly assaulted by a man who held their mouths closed while assaulting them in the early morning hours after they had, possibly, been drinking.

Most of these similarities—that the women were white and blonde, and were assaulted in the early morning hours after drinking—are common to many sexual assaults and not "dissimilar from the methods generally used in such an offense." *See Delgado*, 890 P.2d at 144; *see also Esposito*, 471 A.2d at 953; *State v. Cox*, 787 P.2d 4, 6 (Utah Ct.App. 1990) (evidence of other sexual assaults was inadmissible for the narrow purposes of proving common design or modus operandi because the similarities between the assaults were common to many sexual assault cases and were not particularly distinctive of the defendant's conduct). Further, even assuming that placing one's hand over a victim's mouth is different from the methods commonly used in sexual assaults, this characteristic is insufficient, standing alone, to warrant the admission of evidence about K.U.'s assault. *See Delgado*, 890 P.2d at 144 (the

more prior similar incidents there are, the greater the likelihood that the evidence's logical relevance is independent of an impermissible inference about the defendant's character; thus, a single prior act is sufficiently similar to demonstrate a common plan only where the act is complex and demonstrates a tendency to put multiple steps together into a common plan of action); *see also McKibben*, 862 P.2d at 993; *Lough*, 889 P.2d at 497.[7]

Accordingly, we conclude that the two other alleged assaults were not sufficiently similar to the alleged assault of J.R. for evidence thereof to be properly admissible to show common plan, scheme, or design, or to rebut the defense of consent. The evidence was merely propensity evidence barred by CRE 404(b). It follows that the district court abused its discretion in admitting the evidence. *See Jones v. State*, 714 So.2d 665, 665 (Fla.Dist.Ct.App.1998) (while there were several similarities between the prior offense and the charged offense, because none of the similarities was so unique as to establish a common plan or scheme, and because there were "many more" dissimilarities than similarities, the district court should not have admitted evidence concerning the prior offense); *State v. Hildreth*, 238 P.3d 444, 455–56 (Utah Ct.App.2010) (though there were several similarities between the prior assaults and the charged assault, there were too many variations in the circumstances and conduct for the court to conclude that there was a parallel fact pattern such as would establish the existence of a common scheme or plan); *see also State v. Williams*, 190 Conn. 104, 459 A.2d 510, 512 (1983) (holding that the district court improperly admitted other act evidence to rebut the defense of

---

**5.** Because J.R. died before trial, the People were unable to introduce her statement to the police that defendant had driven her home shortly before assaulting her.

**6.** Though defendant's DNA matched the DNA found in all three women, because DNA evidence is primarily admissible to prove identity, and not otherwise to prove common plan, scheme, or design or to rebut the defense of consent, we do not consider this evidence in this context. *See People v. Groves*, 854 P.2d 1310, 1314–15 (Colo. App.1992) ("Although DNA evidence may be use-

ful to show identification, it is not the type of evidence used to establish modus operandi."). Identity was not contested.

**7.** I.B. testified that one of her assailants put a hand over her mouth before she was taken from her hotel room and assaulted. Her testimony was unclear as to whether that person was defendant (she told the police it was not), and that conduct did not occur during the assault, as it did with J.R.

consent where the two incidents were "very dissimilar" and, therefore, the other act evidence merely suggested the defendant's propensity to commit sexual assault); *State v. Cotton,* 778 So.2d 569, 578–79 (La.2001) (where there was no detailed evidence about the charged offense, the court could not determine whether the prior acts were sufficiently similar as to be logically relevant); *cf. Rath,* 44 P.3d at 1043 (holding that evidence about four other sexual offenses was admissible because, even though there were obvious dissimilarities between the offenses, they shared a number of distinctive and unpredictable personal details, and there were a large number of offenses).

### 3. The Error Requires Reversal

■ We also conclude that the district court's abuse of discretion in admitting evidence of the two alleged prior assaults was not harmless. The People presented their case over four days at trial. However, they introduced evidence about the alleged assault on J.R. only on the first day, and used the bulk of the remaining three days to present evidence about the other two alleged prior assaults. There were no witnesses to the alleged assault; indeed, there were no witnesses who even saw defendant and J.R. together. Moreover, the People's case depended on the alleged nonconsensual nature of the sexual intercourse but, as noted, the SANE nurse testified that J.R.'s only visible injury, the tear to her genitalia, was consistent with consensual intercourse.

In these circumstances, we conclude that there was a reasonable probability that the Rule 404(b) evidence substantially influenced the verdict. *See Yusem,* 210 P.3d at 469–70; *People v. Novitskiy,* 81 P.3d 1070, 1072 (Colo. App.2003) (where the guilty verdict "depended in large part" on Rule 404(b) evidence that the district court improperly admitted to rebut the defendant's defense, the error in

admitting the evidence was not harmless). Therefore, we reverse the judgment of conviction and remand the case for a new trial.

### B. Confrontation Clause

Because J.R. did not testify at trial, defendant contends that the district court violated his Sixth Amendment right of confrontation by admitting (1) the responding officers' testimony about J.R.'s demeanor when they arrived at her apartment; (2) the responding officers' testimony that they brought J.R. to the hospital to be examined for signs of a sexual assault; (3) the emergency room doctor's and SANE nurse's testimony about their examinations of J.R.; (4) J.R.'s statement to the triage nurse that she had been raped; and (5) J.R.'s statement to the emergency room doctor that her assailant had held her mouth closed while he assaulted her.[8] We address these contentions because the admissibility of this evidence is likely to arise if the case is retried.

■ The Sixth Amendment's Confrontation Clause prohibits the admission of testimonial hearsay against a defendant unless the declarant is available to testify at trial or is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the declarant. *Cropper v. People,* 251 P.3d 434, 435–36 (Colo.2011). If the statement is not testimonial, it does not implicate the defendant's confrontation rights under the United States Constitution.[9] *See Michigan v. Bryant,* —— U.S. ——, ——, 131 S.Ct. 1143, 1153, 179 L.Ed.2d 93 (2011); *Davis v. Washington,* 547 U.S. 813, 825 & n. 4, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006); *People v. Robles,* 302 P.3d 269, 277–78, 2011 WL 1195773, *7 (Colo.App.2011). Nor does the admission of nonhearsay implicate those rights. *People v. Robinson,* 226 P.3d 1145, 1151 (Colo.App.2009) (citing *Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

---

8. Defendant also contends that the court improperly admitted the responding officers' testimony that J.R. had called emergency dispatch. However, though the officers testified that they had been dispatched to J.R.'s address on a report of sexual assault, none of them testified that J.R. had called emergency dispatch or otherwise reported the assault.

9. Because defendant contends only that his confrontation rights under the United States Constitution were violated, we do not address whether the admission of the testimony violated his state confrontation clause rights.

■ As relevant here, a statement to medical personnel is testimonial where an objectively reasonable person in the declarant's position would anticipate the statement would be available for use at a later trial. *People v. Vigil,* 127 P.3d 916, 924–25 (Colo. 2006).

■ We first note that the first three pieces of testimony identified above—the officers' and medical personnel's testimony about their personal observations and actions—were not hearsay. *See* CRE 602, 801; *People ex rel. VanMeveren v. Dist. Court,* 195 Colo. 1, 4, 575 P.2d 405, 407 (1978); *People v. Richardson,* 58 P.3d 1039, 1046 (Colo.App.2002). Thus, this testimony did not implicate defendant's right of confrontation. *See People v. Hagos,* 250 P.3d 596, 623 (Colo.App.2009); *Robinson,* 226 P.3d at 1151.

■ As to the fourth and fifth pieces of testimony—J.R.'s statements that she had been raped and that her assailant had held her mouth tightly closed while he assaulted her—we conclude that they were nontestimonial. Before going to the hospital, J.R. gave a detailed description of the assault to a police officer. When she arrived at the hospital, she had to tell the triage nurse why she was there. Thus, an objectively reasonable person in J.R.'s position would not believe that a statement simply identifying the reason for her hospital visit, without any identifying information about her assailant or details of the assault, would be available for use at a later trial. *See Vigil,* 127 P.3d at 924–26.

■ Similarly, the emergency room doctor did not examine J.R. for the purpose of gathering evidence about the assault (which was the SANE nurse's task), but rather to diagnose and treat her pain. Thus, we view her statement that her assailant had caused her neck and jaw pain by holding her mouth closed as one made for the purposes of medical diagnosis and treatment, and, as such, one that an objectively reasonable person would not reasonably believe would be available for use at a later trial. *See id.* at 925–26 (finding persuasive cases considering whether a reasonable person would objectively foresee that his statement might be used in the investigation or prosecution of a crime and noting that an objective child in the victim's circumstances would "reasonably be interested in feeling better and would intend his statements to describe the source of his pain and his symptoms" so that the doctor could "make him feel better and ... formulate a medical diagnosis"); *see also State v. Kirby,* 280 Conn. 361, 908 A.2d 506, 526–27 (2006) (where the victim's statements about the assault were made for purposes of medical treatment and the police had already conducted a more detailed interview, the statements were nontestimonial); *State v. Schaer,* 757 N.W.2d 630, 636 (Iowa 2008) (where the victim's statements to the treatment providers were made to obtain treatment for her injuries and did not occur during a deposition, while under oath, or during a police interrogation, they were not made in circumstances that would lead an objectively reasonable person to believe they would be available for use at a later trial).[10]

10. We note that our supreme court's formulation in *Vigil* of the objectively reasonable person standard for determining if statements to medical personnel are testimonial was based on *Crawford* and preceded the Supreme Court's decision in *Davis,* 547 U.S. 813, 126 S.Ct. 2266. *See Vigil,* 127 P.3d at 924–25. However, courts considering whether statements to medical personnel are testimonial after *Davis* have generally concluded that either (1) statements made primarily for the purposes of medical diagnosis and treatment are not testimonial even if, objectively speaking, a person in the victim's position might reasonably anticipate that her statements could become available for use at a later trial, *see Clark v. State,* 199 P.3d 1203, 1207–12 (Alaska Ct.App.2009); or (2) absent unusual circumstances or police involvement, an objectively reasonable person would not expect statements made primarily for the purposes of medical diagnosis and treatment to be available for use at a later trial, *see, e.g., People v. Cage,* 40 Cal.4th 965, 56 Cal.Rptr.3d 789, 155 P.3d 205, 217 n.14 (2007); *State v. Harper,* 770 N.W.2d 316, 322 (Iowa 2009); *People v. Garland,* 286 Mich.App. 1, 777 N.W.2d 732, 737–38 (2009); *State v. Stahl,* 111 Ohio St.3d 186, 855 N.E.2d 834, 840–41, 844 (2006); *see also Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 312 n. 2, 129 S.Ct. 2527, 2533 n. 2, 174 L.Ed.2d 314 (2009) (noting, in dicta, that medical reports created for treatment purposes are not testimonial). These cases reinforce our conclusion that J.R.'s statement to the doctor was nontestimonial.

Therefore, we conclude that the district court properly admitted these statements.

## C. Recusal of Judge

Because we reverse the convictions for other reasons, we need not address defendant's contention that the trial judge should have recused himself after holding defendant's counsel in contempt during trial, which arises from unique facts, unlikely to be repeated.

The judgment of conviction is reversed, and the case is remanded for a new trial.

Judge ROY and Judge LOEB concur.